# In the United States Court of Federal Claims

BID PROTEST

No. 18-1715C

(Filed Under Seal: March 22, 2019 | Reissued: April 5, 2019)[*]

|  |  |  |
|---|---|---|
| | ) | Keywords: Post-Award Bid Protest; 28 |
| | ) | U.S.C. § 1491; Judgment on the |
| URS FEDERAL SERVICES, INC., | ) | Administrative Record; NASA; |
| | ) | Discussions; Price Reasonableness. |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| THE UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Defendant, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| PAE-SGT PARTNERS, LLC, | ) | |
| | ) | |
| Defendant-Intervenor. | ) | |
| | ) | |
| | ) | |

*Richard B. O'Keeffe, Jr.*, Wiley Rein LLP, Washington, DC, for Plaintiff. *William A. Roberts, III*, *Paul F. Khoury*, *Gary S. Ward*, *Cara L. Lasley*, and *Colin J. Cloherty*, Wiley Rein LLP, Washington, DC, Of Counsel.

*Corinne A. Niosi*, Senior Trial Counsel, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, Washington, DC, for Defendant, with whom were *Douglas K. Mickle*, Assistant Director, *Robert E. Kirschman, Jr.*, Director, and *Joseph H. Hunt*, Assistant Attorney

---

[*] This opinion was originally issued under seal and the parties were given the opportunity to request redactions. The opinion is now reissued with redactions, denoted by [***], a black box, or in the case of the names of third-party offerors, "Offeror A," "Offeror B," and "Offeror C." With respect to the redactions requested by Defendant-Intervenor but opposed by the government and Plaintiff, the Court finds that (1) the information therein is not necessary for the reader to understand the opinion; and (2) that, contrary to the government's position, the information at issue is not "generic" in the same sense as the details the court declined to redact in Inspace 21 LLC v. United States, No. 15-364, 2016 WL 4611057 (Fed. Cl. Sept. 6, 2016). See Joint Status Report at 4, ECF No. 65. The Court has therefore applied the additional redactions requested by the Defendant-Intervenor on the basis that the subject information is "proprietary and confidential." Id. at 1.

General. *Brian M. Stanford*, Senior Attorney, and *Lisette S. Washington*, Attorney-Advisor, NASA Headquarters, Office of the General Counsel, Washington, DC, and *Louis T. Shernisky*, Assistant Chief Counsel, Office of the Chief Counsel, Kennedy Space Center, FL, Of Counsel.

*Anuj Vohra*, Crowell & Moring LLP, Washington, DC, for Defendant-Intervenor. *James G. Peyster*, *Olivia L. Lynch*, *Michelle D. Coleman*, *Sarah A. Hill*, and *Payal P. Nanavati*, Crowell & Moring LLP, Washington, DC, Of Counsel.

## OPINION AND ORDER

**KAPLAN, Judge.**

In this post-award bid protest, Plaintiff URS Federal Services, Inc. ("URS") challenges a decision by the National Aeronautics and Space Administration ("NASA") to award Defendant-Intervenor PAE-SGT Partners, LLC ("PSP") a contract for "baseport operations and spaceport services" at the John F. Kennedy Space Center in Cape Canaveral, Florida.

URS, the incumbent contractor on the predecessor contract at Kennedy Space Center, presents two grounds for its protest. First, it contends that NASA's evaluation of the technical approach outlined in PSP's proposal was arbitrary and capricious. Specifically, it argues that the agency overlooked a large discrepancy between the number of craft and non-craft labor hours needed to perform certain key contractual requirements that were set forth in PSP's "Basis of Estimates" ("BOE") and the number of craft and non-craft labor hours that were contained in NASA's own Independent Government Cost Estimate ("IGCE"). It also contends that to the extent that NASA used a comparator other than the IGCE when reviewing PSP's BOE—namely, NASA's "Internal Government Estimate" ("IGE")—the record contains inadequate documentation of the basis for the IGE.

Second, URS contends that NASA erred by allegedly failing to engage in a price reasonableness analysis before establishing the competitive range. As a result of this error, according to URS, the discussions NASA held with it were neither meaningful nor equal. Thus, URS observes, PSP was given an opportunity during discussions to eliminate all of the weaknesses in its technical proposal. On the other hand, NASA never alerted URS that, to make its proposal competitive with PSP's, it would need to reduce its price (which was ultimately the determinative factor in NASA's decision to award the contract to PSP).

The case is currently before the Court on the parties' cross-motions for judgment on the administrative record. For the reasons discussed below, the Court concludes that URS's arguments lack merit. The agency's award decision was not arbitrary, capricious, or contrary to law. URS's motion is therefore **DENIED** and the government and PSP's cross-motions are **GRANTED**.

## BACKGROUND

### I.   The Solicitation

NASA issued Solicitation NNK18619079R ("the Solicitation") on November 1, 2017. AR Tab 4 at 485. The Solicitation requested proposals for the Kennedy Space Center Base

Operations and Spaceport Services Contract ("the BOSS Contract"). Id. at 479, 485. Under the BOSS Contract, the contractor would provide "mission-focused institutional support at [] Kennedy Space Center and NASA facilities on Cape Canaveral Air Force Station." Id. at 617. Specifically, the BOSS contractor's duties would include managing infrastructure and utilities at Kennedy Space Center as well as coordinating the use of various facilities by several institutional spaceport "users" including NASA, the Air Force, private entities, and other contractors. See generally id. at 640–700. These services would include "operations, maintenance, and engineering (OM&E) of assigned facilities, systems, equipment, and utilities (FSEU); work management and Spaceport integration functions; mission support and launch readiness management; project management and design engineering services; construction support services; and institutional logistics." Id. at 617; see also id. at 807 (list of OM&E organizational users); AR Tab 16 at 29602 (list of baseline customers). The Solicitation defined the period of performance as an initial two-year base period followed by three two-year option periods. AR Tab 4 at 500.

The BOSS contract was structured to provide a set amount of baseline work to fulfill certain known and defined baseline requirements, as well as an IDIQ component to meet fluctuating requirements. AR Tab 2 at 377–78. Two categories of baseline work—Baseline Repairs and Replacements ("BRRs") and Service Orders ("SOs")—are relevant to the resolution of one of URS's protest grounds. BRRs are "request[s] for work to existing infrastructure that is essential to protect, preserve, or restore Facilities, Systems, Equipment, and Utilities (FSEU)," AR Tab 4 at 740, while SOs are "request[s] for facilities-related work that is new in nature and not typically essential to protect, preserve, or restore FSEU," id. at 754.

## II.    The Solicitation's Source Selection Procedures and Evaluation Factors

### A.    Source Selection Procedures

Under the Solicitation, the award would be made to the responsible offeror whose proposal represented the best value to the government. Id. at 582. The Solicitation specified that the BOSS procurement would use competitive negotiated acquisition procedures pursuant to FAR 15.3 and NASA FAR Supplement ("NFS") 1815.3 and that NASA would also use the tradeoff process described in FAR 15.101-1. Id. at 603.

The Solicitation advised prospective offerors that their "initial proposal[s] should contain [their] best terms from a cost or price and technical standpoint," and indicated that NASA did not intend to hold discussions. Id. at 582. Nonetheless, the agency reserved the right to conduct discussions if the contracting officer "later determine[d] them to be necessary." Id.

NASA's Source Evaluation Board ("SEB") would conduct evaluations of the proposals pursuant to NFS 1815.370. Id. at 603. The SEB was comprised of five voting members, six nonvoting members (including the contracting officer), six evaluators, several consultants, and five ex officio members. AR Tab 2 at 398–99.

### B.    Evaluation Factors

As set forth in the Solicitation and in accordance with NFS 1815.304-70, the SEB would evaluate proposals based on three factors: (1) Mission Suitability; (2) Past Performance; and (3)

Price. AR Tab 4 at 603. The Price factor was more important than the Mission Suitability factor, which was more important than the Past Performance factor. Id. The Mission Suitability and Past Performance factors, "when combined, [were] approximately equal to the Price factor." Id. The Solicitation stated that unless it was not in NASA's best interest, it would evaluate price based on the total price for all options plus the total price for the base period. Id. at 604.

### 1. Mission Suitability

The Mission Suitability factor was comprised of three subfactors which would be individually evaluated, numerically scored, and weighted "using the adjectival rating, definitions, and percentile ranges at NFS 1815.305(a)(3)(A)." Id. at 604. These subfactors were Management Approach; Technical Approach; and Small Business Utilization. Id.[1]

NASA's evaluation of PSP's proposal with respect to the Technical Approach subfactor is at issue in this protest. Under that subfactor, proposals would be evaluated to determine, among other things, an offeror's understanding of and ability to perform certain work set out in the Performance Work Statement ("PWS"). Of particular relevance to the current bid protest, the Solicitation required offerors to fill in a "BOE [Basis of Estimate] Template" which itemized both the labor and non-labor resources that the contractor would devote to five categories of work set forth in the PWS: 1) Maintenance; 2) Operations; 3) BRRs; 4) SOs; and 5) Systems Engineering and Engineering Services. Id. at 594, 1960–62. These resources were to be "described in sufficient detail to demonstrate the Offeror's understanding of the requirements and the reasonableness of the proposed approaches." Id. at 594.

### 2. Past Performance

The Solicitation provided that, consistent with FAR 15.305(a)(2) and NFS 1815.305(a)(2), NASA would "evaluate [offerors'] and proposed major subcontractors' recent performance of work similar in size, content, and complexity to the requirements of th[e] solicitation." Id. at 607. Based upon that evaluation, NASA would then assign confidence ratings as provided in NFS 1815.305(a)(2): Very High, High, Moderate, Low, Very Low, or Neutral. Id.; see also NFS 1815.305(a)(2).

### 3. Price

Price—the most important factor—was to be evaluated for reasonableness in accordance with FAR Subpart 15.4. To that end, the Solicitation stated that NASA would perform a price analysis consistent with FAR 15.404-1(b). AR Tab 4 at 607. That provision, in turn, identifies a variety of techniques for assessing price reasonableness, including comparing the offerors' prices

---

[1] Offerors could earn up to 1,000 points as part of the Mission Suitability evaluation—525 points for Management Approach, 375 points for Technical Approach, and 100 points for Small Business Utilization. AR Tab 4 at 604.

to each other and against an independent government cost estimate. NASA reserved the right to reject any proposal with unbalanced pricing. Id. at 582.

Offerors were instructed to submit their pricing on a pricing template. Id. at 598; AR Tab 8 at 15502–03. Although an early version of the Solicitation included a price realism component, the final version omitted that requirement. Compare AR Tab 3 at 440 (requiring that in preparing basis of estimates offerors "ensure consistency" with proposed pricing) with AR Tab 4 at 594 (final Solicitation omitting requirement to ensure consistency with proposed pricing).

## III.   The SEB's Evaluation and the Competitive Range Determination

The Solicitation required that all proposals be fully submitted by December 29, 2017. AR Tab 4 at 479. URS, PSP, and three other offerors submitted timely proposals. AR Tab 16 at 29720.[2] Those proposals were then reviewed by the SEB in accordance with the evaluation scheme described above.

On April 11, 2018, the SEB presented the results of its evaluation to the Source Selection Authority ("SSA"). Id. at 29592. The presentation summarized the evaluation factors as well as the ratings and scores achieved by the offerors. Id. at 29603–08. The SEB also detailed the strengths and weaknesses assigned to each offeror as part of the Mission Suitability evaluation and the reasons for those findings. Id. at 29609–45. The presentation further explained the reasoning for the "Very High" confidence rating assigned for each offeror's past performance. It also included a chart that summarized and compared the total evaluated prices of all proposals to one another and to the IGCE. Id. at 29656.

In the "Final Summary" section of its presentation, the SEB provided the chart below, which detailed the offerors' Mission Suitability adjectival ratings and scores, their Past Performance ratings, and their total evaluated prices:

| Offeror | Mission Suitability Total Points: 1000 | | | | | | | Past Performance | Price |
| | Management 525 Points | | Technical 375 Points | | Small Business 100 Points | | Total | | |
| | Adjectival | Points | Adjectival | Points | Adjectival | Points | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| URS | Good | 357 | Very Good | 323 | Very Good | 85 | 765 | Very High | $670.0M |
| A | Good | 310 | Very Good | 304 | Good | 70 | 684 | Very High | $487.3M* |
| PSP | Good | 362 | Good | 218 | Very Good | 82 | 662 | Very High | $446.9M |
| B | Fair | 194 | Fair | 150 | Very Good | 87 | 431 | Very High | $658.3M |
| C | Fair | 215 | Fair | 120 | Very Good | 83 | 418 | Very High | $488.0M |

---

[2] The other offerors were Offeror A, Offeror B, and Offeror C. AR Tab 16 at 29720.

Id. at 29658.

Because the contracting officer had decided during the evaluation process that discussions should be held, FAR 15.306(c) required the establishment of a competitive range composed of the most highly rated proposals. Id. at 29720. The SEB "recommended that the Government hold discussions with URS, [Offeror A], and PSP, which the SEB determined to be the most highly rated proposals" pursuant to FAR 15.306(c). Id.

On April 12, 2018, the contracting officer prepared a five-page memorandum summarizing the evaluation process and the rationale for her competitive range determination, which matched the SEB's recommendation. See generally id. at 29719–23. In that memorandum, the contracting officer observed that URS had the highest Mission Suitability score but that it also had the highest price. Id. 29721–22. Offeror A had the second highest Mission Suitability score, but discussions were needed to determine whether its proposed price was accurate. Id. at 29722. PSP had the third highest Mission Suitability score and the lowest price. Id.

The contracting officer opined that "[d]iscussions would likely enhance all three proposals, thereby increasing competition, which maximizes the Government's ability to obtain the best value." Id. Although the prices offered by Offeror A and PSP might increase if their proposals were revised, she observed, their proposals, along with that of URS, "represent[ed] the most highly rated after initial evaluation." Id.

## IV.   Discussions with Competitive-Range Offerors

On April 16, 2018, the contracting officer notified the three competitive-range offerors that they were advancing in the procurement and opened discussions. AR Tab 17 at 29727–29; AR Tab 18 at 30075–77; AR Tab 172 at 83781–83. Discussions took place in two to three rounds, as tailored to each proposal, and lasted until July 11, 2018. AR Tab 40 at 71007.

### A.   Discussions with URS

NASA sent URS three clarification questions and two "other" requests for proposal revisions along with its competitive range notification letter. AR Tab 18 at 30075–80. One of the clarification questions was related to the single weakness assigned to URS's proposal (under the Technical Approach subfactor) during the initial evaluation. Id. at 30078–79.

URS's April 23, 2018 response resolved its weakness, leaving unresolved a Management Approach clarification question as well as three additional clarification questions arising out of an intervening solicitation amendment. See Def.'s Cross-Mot. for J. on the Admin. R. & Resp. to Pl.'s Mot. for J. on the Admin. R. ("Def.'s Mot.") at 8, ECF No. 53 (citing AR Tab 22 at 35735–76; AR Tab 39 at 70912–13; AR Tab 18 at 30097–98).

On May 8, 2018, NASA held face-to-face discussions with URS regarding the outstanding clarification questions. AR Tab 18 at 30092, 30106. URS then submitted proposal changes to the agency on May 15, 2018. AR Tab 27 at 43477; see also AR Tab 37 at 70860. Although NASA tentatively scheduled a face-to-face meeting for June 7, 2018, it cancelled that meeting on June 4 based on its determination that there were "no additional clarifications at [that] time." AR Tab 18 at 30148; see also AR Tab 41 at 71071 (NASA statement at debriefing

that "[t]he meeting was scheduled prior to review of the offeror's responses to the previous discussion items and as a result of the Government's review of those responses, there were no remaining weaknesses or items requiring clarifications. Therefore, the meeting was cancelled.").

## B.     Discussions with PSP

In PSP's competitive range notification letter, NASA listed four clarification questions under Management Approach (where PSP had been assigned no weaknesses), four clarification questions under Technical Approach (where it had two significant weaknesses and five weaknesses), and two "other" clarification questions. AR Tab 17 at 29730–35. PSP participated in face-to-face discussions with NASA on May 7, 2018, and submitted proposal changes on May 14, 2018. Id. at 29762.

Because the May 14 submission did not resolve all of PSP's weaknesses and clarification questions, NASA held another face-to-face meeting with PSP on June 6, 2018. Id. at 29898; see also AR Tab 36 at 51075, 51079, 51081, 51088, 51091 (mentions of weaknesses that remained after May 14 revisions). During that round of discussions, NASA provided PSP with an exercise to determine PSP's level of understanding of the process required to categorize BRRs and SOs. See AR Tab 17 at 29895–96, 29900–11.

PSP then submitted another set of proposal changes on June 15, 2018. AR Tab 29 at 45385. Because those revisions left two weaknesses unresolved (including the weakness which had precipitated the categorization exercise) and also introduced two new weaknesses, NASA conducted a teleconference with PSP on July 10, 2018 to discuss all remaining issues. AR Tab 17 at 29916, 29918–20. PSP did not provide any further proposal changes until its final proposal revisions were submitted on July 16, along with those of the other two competitive-range offerors. See AR Tab 40 at 71007.

## C.     Discussions with Offeror A

Like the other two competitive-range offerors, Offeror A's April 16, 2018 competitive range notification letter enclosed its first set of discussion questions. AR Tab 172 at 83781–87. Offeror A had five Management Approach, four Technical Approach, and two "other" clarification questions. Id. at 83784–87. NASA held face-to-face discussions with Offeror A on May 8, 2018, and Offeror A submitted proposal changes on May 14. See, e.g., AR Tab 216 at 90371–73. Because the May 14 revisions introduced "a potential issue" concerning the "total dollar formula" used to categorize BRRs and SOs, NASA held a second face-to-face meeting with Offeror A on June 6, 2018. AR Tab 217 at 90379. In conjunction with that round of discussions, and similar to the exercise it had provided to PSP, NASA "prepared a sample BRR for [Offeror A] to demonstrate its understanding of the categorization process." Id. at 90380. The agency's goal was "to ensure there [were] no areas of misunderstanding related to categorizing BRRs and SOs." Id. Offeror A submitted additional proposal changes on June 11, 2018. See, e.g., AR Tab 216 at 90373, 90377.

## V.     Final Proposal Evaluations

On July 11, 2018, NASA closed discussions and requested final proposal revisions from URS, PSP, and Offeror A by July 16, 2018. AR Tab 17 at 29952–55; AR Tab 18 at 30175–77;

AR Tab 240 at 92206–08. After receiving the final proposal revisions, the SEB completed its final evaluations and presented its findings to the SSA on August 2, 2018. AR Tab 40 at 70916. The following chart, taken from the August 2 presentation, summarizes the evaluations of the initial and the final revised proposals of each of the three offerors:

| Offeror | | Mission Suitability Total Points: 1000 | | | | | | | Past Performance | Price |
|---------|------|-------------|--------|-------------|--------|-------------|--------|-------|------------------|-------|
| | | Management 525 Points | | Technical 375 Points | | Small Business 100 Points | | Total | | |
| | | Adjectival | Points | Adjectival | Points | Adjectival | Points | | | |
| PSP | Initial | Good | 362 | Good | 218 | Very Good | 82 | 662 | Very High | $446.9M |
| | Final | Good | 362 | Very Good | 338 | Very Good | 82 | 782 | Very High | $466.8M |
| URS | Initial | Good | 357 | Very Good | 323 | Very Good | 85 | 765 | Very High | $670.0M |
| | Final | Good | 357 | Very Good | 326 | Very Good | 85 | 768 | Very High | $672.1M |
| A | Initial | Good | 310 | Very Good | 304 | Good | 70 | 684 | Very High | $487.3M |
| | Final | Good | 341 | Very Good | 323 | Good | 70 | 734 | Very High | ■ |

Id. at 70966.

As the chart illustrates, PSP's Technical Approach rating increased significantly (from 218 to 338 points) between the evaluation of its initial and final proposals. This increase stemmed largely from PSP's resolution during discussions of the two significant weaknesses and five other weaknesses initially assigned to its proposal under the Technical Approach subfactor. See id. at 70933–41.

As the ratings stood after the evaluation of the final revised proposals, PSP and URS's prices had not changed significantly, but their Mission Suitability scores were closer. In fact, PSP had pulled ahead of URS by a relatively small number of points. Although URS resolved the single weakness initially assigned to its proposal, its revisions amounted to an increase of three points in its Mission Suitability score as compared to PSP's improvement of 120 points. Meanwhile, Offeror A also improved its score, but came in third on Mission Suitability and increased its price by approximately $[***] million.

## VI.    Source Selection Decision and Award to PSP

During the August 2 SEB presentation, the SSA "carefully considered [the SEB's] findings and questioned the SEB on the material presented." AR Tab 40 at 71014. He also "solicited and considered the views of the individual members of the SEB and other [Kennedy Space Center] senior officials in attendance." Id. at 71015.

In documenting his source selection decision, the SSA summarized the SEB's findings and the merits of the remaining three proposals both independently and in relation to one another. Id. at 71007–19. The SSA observed that all three offerors had performed well under the Mission Suitability factor, and that after final proposal revisions "the SEB found no weakness, significant weakness, or deficiency among the proposals." Id. at 71015. "Therefore, in [his] comparative assessment," the SSA did not "place significant weight on the offerors' scores,

which [were] merely analytical aids, but instead focus[ed] on the qualitative benefits associated with the differences among the proposals." Id.

After a detailed comparative review of the qualitative features of each proposal, the SSA "found the offerors' proposals to be of similarly high quality." Id. at 71017. However, the SSA noted that "PSP's proposal included aspects similar to those of URS's proposal (i.e., use of technologies) and other aspects similar to those of [Offeror A]'s proposal (i.e., [***]) that the SEB found . . . to greatly enhance the potential for successful contract performance." Id. Accordingly, as to Mission Suitability the SSA found PSP's proposal to be "somewhat superior" to URS's, and found both of those proposals to be "somewhat superior to [Offeror A]'s proposal." Id. The SSA noted, however, that the differences in the proposals were "minor across all three offerors." Id.

As to Past Performance, the SSA reviewed in detail each offeror's relevant experience, which had led the SEB to assign a confidence level of "Very High" to all three offerors. Id. at 71017–18. The SSA concluded his discussion of the Past Performance factor by stating that he had a "very high level of confidence that all of the offerors could successfully perform the required effort," and that there was "no evidence within the Past Performance factor evaluation to meaningfully discriminate between offerors." Id. at 71018.

Turning finally to the Price factor, the SSA noted that, per the terms of the Solicitation, Price was the most important factor; specifically it was approximately equal to the non-price factors combined and was "more important than either non-price factor individually." Id. at 71019. As a result, the SSA observed, "significant differences in price among the proposals warrant[ed] meaningful consideration." Id. The SSA also recognized that in a fixed-price contract like the BOSS contract, the contractor takes on "maximum risk and full responsibility for all costs and resulting profit or loss." Id.

The SSA reported that he had "questioned the SEB" on the significant price differences among the proposals—ranging from URS's price of $672.1 million to PSP's price of $466.8 million, with Offeror A in the middle at $[***] million. Id. As summarized by the SSA, the SEB "explained that PSP, in particular, made statements in its proposal to the effect that it knowingly assumed an aggressive pricing strategy involving management challenges to profit. In essence, PSP [was] confident in its program management and technical approaches." Id.

In light of the significant differences between the offerors' prices and the lack of "significant discriminators" on non-price factors, the SSA found that Price was "the only significant discriminator among the proposals, and [was] therefore the determinative factor." Id. The SSA selected PSP for award because it "offered the lowest price by a significant margin and [was] approximately equivalent or slightly better than URS and [Offeror A] under non-price evaluation factors." Id. Accordingly, "PSP's proposal represent[ed] the best value to the Government." Id. The three offerors were informed of the award decision on August 6, 2018. AR Tab 17 at 29963–64; AR Tab 18 at 30181–82; AR Tab 242 at 92245–46.

## VII.   Post-Award Debriefing

URS requested post-award debriefing on August 6, 2018, the same day it was notified it had not been awarded the contract. AR Tab 41 at 71021. A face-to-face debriefing took place on August 10, 2018. Id. at 71036–67, 71088 (contracting officer's memorandum summarizing URS debriefing). The debriefing summarized the SEB's final evaluation of URS's proposal and also revealed the scores, ratings, and prices of both URS and PSP's proposals. Id. at 71052–66.

## VIII.   URS's Bid Protests

URS filed a post-award protest at GAO on August 15, 2018. AR Tab 48 at 71785. Before GAO could issue a decision on the merits, however, offeror KBA filed a pre-award protest in this Court on October 9, 2018. AR Tab 71 at 72580–81. As a result, on October 26, 2018, GAO dismissed URS's protest without reaching its merits. Id.

URS then filed the instant protest in this court on November 5, 2018. ECF No. 1. On November 7, 2018, while the case was briefly consolidated with KBA's protest, the Court granted PSP's motion to intervene. Order, KSC Boss Alliance, LLC & URS Federal Servs., Inc. v. United States & PAE-SGT Partners, LLC, No. 1:18-cv-01559-EDK (Fed. Cl. Nov. 7, 2018), ECF No. 32. URS filed its motion for judgment on the administrative record on December 13, 2018 (ECF No. 46), and the government and PSP filed cross-motions for judgment on the administrative record ("the cross-motions") on February 13, 2019 (ECF Nos. 52, 53).[3] All of the parties' motions have been fully briefed. ECF Nos. 58–60. Oral argument was held on March 15, 2019.

## DISCUSSION

## I.   Subject-Matter Jurisdiction

The Court of Federal Claims has jurisdiction over bid protests in accordance with the Tucker Act, 28 U.S.C. § 1491, as amended by the Administrative Dispute Resolution Act of 1996 § 12, 28 U.S.C. § 1491(b). Specifically, the Court has the authority "to render judgment on an action by an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement." 28 U.S.C. § 1491(b)(1); see also Sys. Application & Techs., Inc. v. United States, 691 F.3d 1374, 1380–81 (Fed. Cir. 2012) (observing that § 1491(b)(1) "grants jurisdiction over objections to a solicitation, objections to a proposed award, objections to an award, and objections related to a statutory or regulatory violation so long as these objections are in connection with a procurement or proposed procurement").

To possess standing to bring a bid protest, a plaintiff must be an "interested party"—i.e., an actual or prospective bidder (or offeror) who possesses a direct economic interest in the procurement. Sys. Application & Techs., Inc., 691 F.3d at 1382 (citing Weeks Marine, Inc. v.

_____
[3] The briefing schedule was interrupted and prolonged by a lapse in government appropriations from December 21, 2018 through January 25, 2019. See ECF Nos. 47–50.

United States, 575 F.3d 1352, 1359 (Fed. Cir. 2009)); see also Orion Tech., Inc. v. United States, 704 F.3d 1344, 1348 (Fed. Cir. 2013). An offeror has a direct economic interest if it suffered a competitive injury or prejudice as a result of an alleged error in the procurement process. Myers Investigative & Sec. Servs., Inc. v. United States, 275 F.3d 1366, 1370 (Fed. Cir. 2002) (holding that "prejudice (or injury) is a necessary element of standing"); see also Weeks Marine, Inc., 575 F.3d at 1359.

In post-award protests, like this one, a plaintiff may demonstrate competitive injury or prejudice by showing that it would have had a "substantial chance" of winning the award "but for the alleged error in the procurement process." Weeks Marine, Inc., 575 F.3d at 1359–61 (quoting Info. Tech. & Applications Corp. v. United States, 316 F.3d 1312, 1319 (Fed. Cir. 2003)). In making the standing determination, the Court assumes well-pled allegations of error in the complaint to be true. Square One Armoring Serv., Inc. v. United States, 123 Fed. Cl. 309, 323 (2015) (citing Digitalis Educ. Sols., Inc. v. United States, 97 Fed. Cl. 89, 94 (2011), aff'd, 664 F.3d 1380 (Fed. Cir. 2012)); see also Salmon Spawning & Recovery All. v. U.S. Customs & Border Prot., 550 F.3d 1121, 1131 & n.9 (Fed. Cir. 2008) (citing Lujan v. Defs. of Wildlife, 504 U.S. 555, 561 (1992)); Linc Gov't Servs., LLC v. United States, 96 Fed. Cl. 672, 695 (2010) (noting that the showing of prejudice as an element of standing "turns entirely on the impact that the alleged procurement errors had on a plaintiff's prospects for award, taking the allegations as true," and distinguishing "allegational prejudice" required to establish standing from the "prejudicial error" required to prevail on the merits).

URS has standing to pursue the present bid protest. Taking its allegations of error to be true, URS would have had a "substantial chance" at award but for the alleged errors. Specifically, if NASA erred in its evaluation of PSP's technical approach and/or if the agency was required to discuss URS's price, URS could have won the contract award because price was "the determinative factor," AR Tab 40 at 71019, and the SSA found URS's proposal overall to be of similarly high quality to PSP's proposal, id. at 71017–19.

## II.     Motions for Judgment on the Administrative Record

Parties may move for judgment on the administrative record pursuant to Rule 52.1 of the Rules of the Court of Federal Claims ("RCFC"). Under RCFC 52.1, the Court reviews an agency's procurement decision based on the administrative record. See Bannum, Inc. v. United States, 404 F.3d 1346, 1353–54 (Fed. Cir. 2005). The Court makes "factual findings under RCFC [52.1] from the record evidence as if it were conducting a trial on the record." Id. at 1357. Thus, "resolution of a motion respecting the administrative record is akin to an expedited trial on the paper record, and the Court must make fact findings where necessary." Baird v. United States, 77 Fed. Cl. 114, 116 (2007). The Court's inquiry is "whether, given all the disputed and undisputed facts, a party has met its burden of proof based on the evidence in the record." A&D Fire Prot., Inc. v. United States, 72 Fed. Cl. 126, 131 (2006). Unlike a summary judgment proceeding, genuine issues of material fact will not foreclose judgment on the administrative record. Bannum, Inc., 404 F.3d at 1356.

## III.     Scope of Review of Procurement Decisions

The Court reviews challenges to procurement decisions under the same standards used to evaluate agency actions under the Administrative Procedure Act, 5 U.S.C. § 706. See 28 U.S.C. § 1491(b)(4) (stating that "[i]n any action under this subsection, the courts shall review the agency's decision pursuant to the standards set forth in section 706 of title 5"). Thus, to successfully challenge an agency's procurement decision, a plaintiff must show that the agency's decision was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); see also Bannum, Inc., 404 F.3d at 1351.

This "highly deferential" standard of review "requires a reviewing court to sustain an agency action evincing rational reasoning and consideration of relevant factors." Advanced Data Concepts, Inc. v. United States, 216 F.3d 1054, 1058 (Fed. Cir. 2000) (citing Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc., 419 U.S. 281, 285 (1974)). Accordingly, the Court cannot substitute its judgment for that of the agency. See Honeywell, Inc. v. United States, 870 F.2d 644, 648 (Fed. Cir. 1989) (holding that as long as there is "a reasonable basis for the agency's action, the court should stay its hand even though it might, as an original proposition, have reached a different conclusion" (quoting M. Steinthal & Co. v. Seamans, 455 F.2d 1289, 1301 (D.C. Cir. 1971))). Instead, the Court's function is limited to "determin[ing] whether 'the contracting agency provided a coherent and reasonable explanation of its exercise of discretion.'" Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d 1324, 1332–33 (Fed. Cir. 2001) (quoting Latecoere Int'l, Inc. v. U.S. Dep't of Navy, 19 F.3d 1342, 1356 (11th Cir. 1994)); see also Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983) (noting that a court should review agency action to determine if the agency has "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action").

A disappointed offeror "bears a heavy burden" in attempting to show that a procuring agency's decision lacked a rational basis. Impresa, 238 F.3d at 1338. For the agency to prevail, it need only articulate "a rational connection between the facts found and the choice made," and courts will "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." Motor Vehicle Mfrs. Ass'n, 463 U.S. at 43 (quotations omitted). Thus, the agency's action is vulnerable to challenge only if the plaintiff can show that the agency "entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or [made a decision that] is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." Id.

## IV.     NASA's Evaluation of PSP's Technical Approach

URS contends that NASA's evaluation of PSP's proposal under the Technical Approach subfactor was arbitrary and capricious, arguing that NASA "failed to analyze a key question about PSP's proposal: does PSP understand the level of resources that will be needed to perform two key requirements, Baseline Repairs and Replacements [or BRRs] and Service Orders [or SOs]?" Pl.'s Mem. in Supp. of Mot. for J. on the Admin. R. ("Pl.'s Mem.") at 9, ECF No. 46-1. URS asserts that PSP "proposed significantly fewer resources than the Agency's internal estimates showed it needed" for BRRs and SOs in the first year of performance. Id. at 12. Specifically, according to URS, the number of craft labor hours that PSP estimated were

necessary to perform the BRRs and SOs was only [***]% of the number of craft hours for BRRs and SOs that is reflected in the underlying data that NASA used to develop its Independent Government Cost Estimate. Pl.'s Mem. at 12–13 (citing AR Tab 11); see AR Tab 11 at 23172 (labeled "IGCE Template Build"). In addition, PSP's estimate of non-craft hours required was only [***]% of those derived from that data. Pl.'s Mem. at 13. These discrepancies, URS argues, "demonstrate[d] an alarming lack of understanding of the Solicitation's requirements" on PSP's part; yet, URS claims, the SEB and SSA failed to consider or even notice their existence. Id. at 14.

URS's argument fails for several reasons, foremost among them because NASA did not employ the data reflected in the IGCE to evaluate the offerors' technical approaches. Instead, it used a separate internal government estimate (or IGE) for that purpose. As the government explains, the IGE was tailored to NASA's goal of assessing the soundness of the offerors' proposals based on the information they supplied in their BOEs. It "identifie[d] the direct craft labor hours needed to perform the [BRRs] and the [SOs]" on the basis of "historical data." Def.'s Mot. at 16 (citing AR Tab 36 at 53546–4331); see also AR Tab 60 at 72473 (NASA submission before GAO explaining that the IGE "reflect[s] historical actual or future estimated resources as reported on the current Institutional Services Contract"). NASA compared offerors' BOEs to this historical data to help determine whether offerors understood the technical requirements of the contract. See AR Tab 12 at 26813 (initial evaluation of PSP estimate against IGE); AR Tab 13 at 27797 (initial evaluation of URS estimate against IGE); AR Tab 36 at 54325 (final evaluation of PSP estimate against IGE); AR Tab 37 at 67507 (final evaluation of URS estimate against IGE); AR Tab 125 at 81939 (initial evaluation of Offeror A estimate against IGE); AR Tab 150 at 83291 (initial evaluation of Offeror C estimate against IGE); AR Tab 107 at 79850 (initial evaluation of Offeror B estimate against IGE).

In this case, the Solicitation did not prescribe a particular method for analyzing the BOEs to assess the offerors' understanding of the technical requirements or the reasonableness of their approaches. And determining what standards to use to evaluate proposals for their technical quality requires the special expertise of procurement officials. Reviewing courts therefore give the greatest deference possible to these determinations. See E.W. Bliss Co. v. United States, 77 F.3d 445, 449 (Fed. Cir. 1996) (protests concerning "the minutiae of the procurement process in such matters as technical ratings . . . involve discretionary determinations of procurement officials that a court will not second guess"); see also One Largo Metro, LLC v. United States, 109 Fed. Cl. 39, 74 (2013) (observing that "the evaluation of proposals for their technical excellence or quality is a process that often requires the special expertise of procurement officials, and thus reviewing courts give the greatest deference possible to these determinations") (quoting Beta Analytics Int'l, Inc. v. United States, 67 Fed. Cl. 384, 395 (2005)).

The agency clearly acted within its broad discretion when it chose to use historical data regarding craft labor hours as the yardstick against which to evaluate offerors' understanding of the level of resources needed to perform the BRRs and SOs. Indeed, it is unclear to the Court that URS argues otherwise. Instead, URS's argument appears to be that it would have been more appropriate for the agency to use the IGCE as a point of comparison, and for it to also consider the non-craft labor hours reflected in the offerors' BOEs when considering their understanding of the technical requirements.

This contention must be rejected, given the substantial deference afforded to the agency in such matters. The bottom line is that the agency developed the IGCE to evaluate price, not technical approach. And, as the government explains, there are a number of problems with using the IGCE data to evaluate the offerors' BOEs. Among other things, the data that was used as the basis for the IGCE overstates the number of labor hours needed to perform the BRRs and SOs because it includes labor that is allocated to that work solely for pricing purposes. Def.'s Mot. at 15–16. Further, the IGCE employed generous assumptions about the labor that would be required because its purpose was to serve as a vehicle to secure funding from Kennedy Space Center's customers. See AR Tab 36 at 51077; AR Tab 40 at 70969–72.

URS also complains that NASA's IGE "is nothing more than '[a] page with numbers' that—if not altogether wrong—are at least 'completely lacking in any notes or back-up documentation.'" Pl.'s Reply in Supp. of Mot. for J. on the Admin. R. & Resp. to Def.'s & Intervenor's Cross Mots. ("Pl.'s Reply") at 4, ECF No. 58 (quoting Nutech Laundry & Textile, Inc. v. United States, 56 Fed. Cl. 588, 594 (2003)). But as noted, the record supports the government's representations before GAO and this Court that the IGE was not just a "page with numbers" drawn out of thin air. Instead, the numbers are based on historical data from the predecessor contract. E.g., AR Tab 38 at 70883–84 (observing that "the Government based its estimate for the total craft labor hours to perform preventative maintenance and incidental repairs on current work practices and did not take into account any potential efficiencies").

In that regard it is telling that—while complaining about the absence of back-up notes or documentation to support the IGE—URS (the incumbent on the predecessor contract) never actually contends that the IGE does not accurately reflect historical data about craft labor hours devoted to performance of the BRRs and SOs. Nor could it credibly do so, for URS's proposal itself explicitly stated that the labor hours included in its BOE were "evaluated/developed from historical averages," see, e.g., AR Tab 13 at 27013, and the craft labor hours set forth in URS's own BOE range from 93% to 102% of the IGE, AR Tab 37 at 67507. That close alignment lends further credence to the validity of the estimates contained in the IGE.

Because URS does not provide any basis for the Court to question the validity of the historical data reflected in the IGE, the Court finds unpersuasive URS's contention that a remand is required to allow NASA to review the IGE and supply back-up notes and other documentation to support it. In that regard, URS's reliance on Nutech Laundry & Textile is misplaced. In Nutech, the plaintiff brought a pre-award protest to the agency's decision to withdraw an RFP based on its conclusion that the plaintiff (the sole offeror) had proposed an unreasonable price. 56 Fed. Cl. at 593–94. The finding of unreasonableness was based on an independent government cost estimate that was reflected in a summary one-page document with no supporting documentation that would permit the court to assess its validity. Id. at 594. The plaintiff challenged the figures in the cost estimate as unrealistic and understated. Id. The court acknowledged that a cost estimate "need not be supported with exhaustive details." Id. Nonetheless, it found that without further documentation the contracting officer's price determination could not be upheld, reasoning that "the agency must be able to demonstrate the basis for the estimate, where as here, the analysis is questioned." Id.

Here, unlike in Nutech, the record reflects the basis for the number of labor hours set forth in the IGE. Specifically, it shows that NASA based those numbers on historical data.

Further, URS does not challenge the validity of the numbers as accurate reflections of the historical data. In fact, as noted, the craft labor hours URS proposed in its BOE are very close to those contained in the IGE. There is therefore no need for the agency to produce and the Court to review additional back-up documentation to support the rationality of the estimates NASA employed. A remand to require NASA to provide such documentation would be pointless and would only delay the inevitable.

URS further asserts that the record contains "no specific conclusion" that PSP understood the contract requirements and no "explanation of why the Agency might have" so concluded, given that PSP estimated craft labor hours for BRRs and SOs that were [***]% of the historical averages set forth in the IGE. Pl.'s Reply at 9. But contrary to URS's argument, it is clear from the record that NASA did conduct a comparison of PSP's BOE with the IGE's labor hours for BRRs and SOs. See AR Tab 36 at 54309. It is also clear that NASA did not find the difference in PSP's proposed labor hours and the IGE problematic with respect to the BRRs and SOs.

Thus, NASA did not assign a weakness to PSP's proposal with respect to the craft labor hours listed in the BOE for the BRRs and SOs, but did find that PSP's initial BOE reflected a weakness based on the shortfall in the number of hours proposed for Maintenance and Systems Engineering. See, e.g., AR Tab 38 at 70881–88. If NASA had concluded that a weakness existed as to the craft labor dedicated to the BRRs and SOs, then it would have issued an evaluation finding to that effect.

Further, the record includes documentation supporting NASA's satisfaction with PSP's technical approach, notwithstanding that PSP's BOE specified fewer craft labor hours for BRRs and SOs than had historically been employed. NASA thus identified various strengths in PSP's technical approach that could lead to greater efficiencies in the performance of these tasks. See, e.g., id. at 70871 (observing that "[***]"); id. at 70875 ("The synergies created by [***] will greatly increase the likelihood of successful contract performance by increasing productivity through resource optimization."). The Court concludes, therefore, that the record sufficiently documents a basis for NASA's conclusion that the difference between PSP's BOE and the IGE did not reflect any weakness in PSP's technical approach. See Telos Corp. v. United States, 129 Fed. Cl. 573, 578 (2016) (The FAR does not require a documented explanation of "why the staffing [proposed by an offeror] was found adequate for each task to be performed under the contract.").

In short, NASA acted well within its discretion when it used the IGE to evaluate PSP's BOE (as it did for all offerors, including URS). The record further establishes that the agency was aware that PSP proposed craft labor hours for BRRs and SOs that were lower than the estimates in the IGE but that it did not consider those differences problematic. Accordingly, URS's challenge to NASA's evaluation of PSP's technical approach lacks merit.

## V.     NASA's Failure To Raise Price in Its Discussions with URS

URS's second protest ground concerns the adequacy and fairness of the discussions NASA held with the offerors. According to URS, NASA did not perform a price reasonableness analysis before it established the competitive range. Had NASA done so, URS argues, it would have found URS's price unreasonable and accordingly would have been required to raise price

with URS during discussions. Instead, URS contends, NASA worked diligently with PSP to resolve the weaknesses in its proposal, but failed to give URS an opportunity to lower its price, which was ultimately the discriminating factor in the agency's decision to award the contract to PSP rather than URS.

Under the FAR, where an agency establishes a competitive range and holds discussions with offerors, those discussions must cover "deficiencies, significant weaknesses, and adverse past performance information." FAR 15.306(d)(3).[4] Beyond these required subjects, "[t]he scope and extent of discussions are a matter of contracting officer judgment." Id. "[T]he contracting officer is not required to discuss every area where the proposal could be improved." Id. In particular, where an agency determines a proposal's price is acceptable, it need not raise it during discussions. JWK Int'l Corp. v. United States, 279 F.3d 985, 988 (Fed. Cir. 2002); see also Lyon Shipyard, Inc. v. United States, 113 Fed. Cl. 347, 356 (2013) (The FAR "gives the contracting officer discretion to inform an offeror that 'its price is considered by the Government to be too high or too low.' But neither that provision, nor any other, requires the contracting officer to discuss a proposed price that is not considered a significant weakness or deficiency.") (quoting FAR 15. 306(e)(3)); DMS All-Star Joint Venture v. United States, 90 Fed. Cl. 653, 669 (2010) (observing that "if an offeror's costs are not so high as to be unreasonable and unacceptable for contract award, the agency may conduct meaningful discussions without raising the issue of the offeror's costs") (quoting Yang Enters., Inc.; Santa Barbara Applied Research, Inc., B–294605.4, 2005 CPD ¶ 65, 2005 WL 832109, at *9 (Comp. Gen. Apr. 1, 2005)).

In this case, there is nothing in the record to suggest that NASA found URS's initial price proposal unacceptable or unreasonable. The Solicitation required the SEB to "perform a price analysis in accordance with FAR 15.404-1(b)." AR Tab 4 at 607 (Solicitation); AR Tab 40 at 70963 (SEB presentation to SSA). Under the FAR, a "[c]omparison of proposed prices received in response to [a] solicitation" is typically a satisfactory price analysis technique because "[n]ormally, adequate price competition establishes a fair and reasonable price." FAR 15.404-1(b)(2)(i) (citing FAR 15.403-1(c)(1)(i)). Similarly, a comparison of proposed prices with the IGCE is a valid price analysis technique. See id. at (2)(v); see also Tech Sys., Inc. v. United States, 98 Fed. Cl. 228, 264 (2011) (A "price reasonableness analysis satisfied the requirements of the FAR" where "multiple offerors competed independently with their price proposals, and the Contract Specialist compared offerors . . . to an IGCE based on historical costs.").

The record reflects that the SEB undertook this analysis. It includes charts prepared by the SEB which compared the offerors' proposed prices to one another and to the IGCE on a CLIN-by-CLIN basis, as well as on the basis of total evaluated price. AR Tab 40 at 70963–64. Further, the record reveals that as part of the price analysis, the agency recalculated and revised the IGCE to address a number of assumptions contained in the estimate which turned out to be

---

[4] A deficiency is a "material failure of a proposal to meet a Government requirement or a combination of significant weaknesses in a proposal that increases the risk of unsuccessful contract performance to an unacceptable level." FAR 15.001. A "significant weakness" is a "flaw that appreciably increases the risk of unsuccessful contract performance." Id.

inconsistent with the offerors' proposals (such as, for example, an assumed higher rate of profit than the average rate of the offerors). AR Tab 16 at 29680.

As the SSA confirmed in his source selection decision, the SEB conducted an initial price evaluation and it "found each of the offeror's price[s] to be fair and reasonable" at the time the competitive range was established. AR Tab 40 at 71006. The SEB also evaluated the price proposals for unbalanced pricing and found none. Id. And while the competitive range determination memorandum itself did not explicitly state that the SEB had found all of the offerors' prices reasonable, that is its clear implication.

Thus, the contracting officer discussed the offerors' prices in the context of comparing the highest scored proposals to one another. She noted that while URS had the highest Mission Suitability Score, it also had the highest price. AR Tab 16 at 29720–21. She did not suggest, however, that URS's price was so high as to be unreasonable. Indeed, the agency would have been hard-pressed to have found URS's price proposal unreasonable. For while URS's total evaluated price was significantly higher than that of PSP and Offeror A, it was still approximately 25% below the original IGCE and only about 2.5% higher than a revised IGCE that NASA prepared as part of its competitive range determination process to adjust for assumptions contained in the offerors' proposals. See AR Tab 11 at 23877 (showing both original IGCE of $874.4 million and revised IGCE of $655.5 million). It was also only 1.75% higher than its nearest competitor, Offeror B, whose proposal was eliminated from the competitive range because of its relatively low scores on its management and technical approaches, not because its price was unreasonable. It is also worthy of note that the SEB explicitly found the price in URS's final proposal reasonable, notwithstanding that it was slightly higher than the price contained in its initial proposal. AR Tab 35 at 50696–97.

There is similarly no merit to URS's contention that—even if the agency did determine that its price was reasonable—NASA was required to discuss price with URS because it "had zero chance for award unless it substantially lowered its price" and because the award decision "makes clear that [NASA] would not award to URS at its proposed price." Pl.'s Reply at 15. To be sure, it is undisputed that, because the final three proposals were found essentially equal from a technical and past performance standpoint, price ultimately became "the determinative factor." See AR Tab 40 at 71019. But it was not evident at the outset of discussions that price would become determinative, given the weaknesses the SEB identified in the other offerors' initial proposals.

Contracting agencies are not required to discuss proposal features that "eventually prove[] determinative of the contract award" where, as here, those features do not constitute significant weaknesses or deficiencies. DMS All-Star, 90 Fed. Cl. at 669 (citing Structural Assocs., Inc./Comfort Sys. USA (Syracuse) Joint Venture v. United States, 89 Fed. Cl. 735, 743–44 (2009)). Thus, "[m]andatory discussions . . . are designed to point out shortcomings in an offeror's proposal as judged from the standpoint of the government's stated needs, rather than

from the standpoint of the proposal's relative competitiveness." <u>Structural Assocs.</u>, 89 Fed. Cl. at 743.[5]

Finally, URS argues that the discussions that NASA held were unequal because, while never raising price as a concern with URS, NASA spent significant time and effort attempting to resolve PSP's weaknesses and allowing it to enhance its proposal. Indeed, URS observes, NASA went beyond the FAR's requirements when it discussed areas of weakness with PSP that were not "significant weaknesses" and therefore not a mandatory topic for discussions.

This contention also lacks merit. FAR 15.306(e)(1) provides that when conducting discussions, the government may not "engage in conduct that . . . favors one offeror over another." But while "[a]ll contractors and prospective contractors" must "be treated fairly and impartially," they "need not be treated the same." FAR 1.102-2(c)(3). Discussions thus must be "tailored to each offeror's proposal." FAR 15.306(d)(1).

In this case, URS does not contend that NASA raised issues with PSP that were "identical" or even similar to issues implicated by URS's proposal but not discussed. <u>See</u> <u>Am. Corr. Healthcare, Inc. v. United States</u>, 137 Fed. Cl. 395, 416 (2018) (recognizing that "[i]f, during discussions, a procuring agency raises an issue with one offeror, and the identical issue is implicated by another offeror's proposal, it must also raise that issue with the second offeror"). In fact, NASA also allowed URS to address and resolve the technical weakness in its initial proposal, notwithstanding that it was not a "significant" one. <u>See, e.g.</u>, AR Tab 37 at 70868–69. And price was not raised with any offeror during discussions because none of the prices were found unreasonable or otherwise noncompliant.

Further, the initial evaluation resulted in the assignment of more weaknesses (both "significant" and otherwise) to PSP's proposal than were assigned to the proposal URS submitted. It is therefore neither surprising nor unfair that NASA spent more time in discussions with PSP, and that those discussions covered a larger number of topics than did the discussions NASA held with URS. Because NASA was merely fulfilling its obligation under FAR 15.306(d)(1) to tailor discussions to each offeror's proposal, the Court rejects URS's allegation of error based on unequal discussions.

## CONCLUSION

For the reasons discussed above, URS's motion for judgment on the administrative record is **DENIED**, and the government and PSP's cross-motions for judgment on the

---

[5] URS observes that in <u>DMS All-Star</u> the court held that "if an agency finds that a proposed price is so high as to essentially 'preclude award,' it may still have an obligation to inform the offeror." Pl.'s Mem. at 21 (quoting <u>DMS All-Star</u>, 90 Fed. Cl. at 669). It also references language in the decision to the effect that price must be discussed when it is an "impediment" to award. Pl.'s Reply at 15 (quoting <u>DMS All-Star</u>, 90 Fed. Cl. at 670). But as the court made clear in <u>DMS All-Star</u>, a proposal's high price does not "preclude award" or represent an "impediment" to an award if the price is "not unreasonable" and lies "well within an acceptable overall bid price range." <u>DMS All-Star</u>, 90 Fed. Cl. at 669 (citations omitted).

administrative record are **GRANTED**. The Clerk is directed to enter judgment accordingly. Each party shall bear its own costs.

      **IT IS SO ORDERED.**


                        s/ Elaine D. Kaplan
                        ELAINE D. KAPLAN
                        Judge